UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------

JEFFREY RUBIN,

                Plaintiff,

      v.

OAK STREET HEALTH, INC., MIKE
PYKOSZ, GEOFFREY PRICE, GRIFFIN
MYERS, ROBBERT VORHOFF, SRDJAN
VUKOVIC, PAUL KUSSEROW, KIM
KECK, CHERYL DORSEY, JULIE
KLAPSTEIN, MOHIT KAUSHAL and
REGINA BENJAMIN,

                Defendants.

Case No. 23-cv-2838

**COMPLAINT FOR (I) VIOLATIONS
OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT
OF 1934 AND (II) BREACHES OF
FIDUCIARY DUTY UNDER
DELAWARE LAW**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Jeffrey Rubin ("Plaintiff"), by the undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to Plaintiff's own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

## <u>NATURE OF THE ACTION</u>

1.    This action is brought by Plaintiff against Oak Street Health, Inc. ("Oak Street" or the "Company") and the members of the Company's Board ("Board") for (i) violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"), and (ii) breaches of fiduciary duties under Delaware law. Plaintiff's claims arise in connection with the solicitation of public stockholders of Oak Street to, *inter alia*, vote in favor of a merger transaction ("Merger") pursuant to which Oak Street will

merge into an affiliate of CVS Health Corporation ("CVS"), in exchange for payment of $39.00 per share in cash by CVS to Oak Street stockholders.

2.     On February 8, 2023, Oak Street announced that the Board had approved the sale of the Company to CVS for $39.00 per share in cash ("Merger Consideration"), pursuant to a merger agreement ("Merger Agreement").

3.     On March 30, 2023, Defendants authorized the filing of a false and misleading definitive proxy statement on Schedule 14A ("Proxy") with the SEC, in (i) violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, and (ii) breach of fiduciary duties under Delaware law, with the aim of soliciting Oak Street stockholders to vote for the Merger.

4.     As detailed below, the Proxy contains material misrepresentations, and material omissions that render statements therein misleading. These material misrepresentations and omissions render the Proxy false and misleading in violation of the above-referenced Exchange Act provisions and Rule 14a-9, and Delaware law.

5.     The Proxy advises that a special meeting ("Special Meeting") of Oak Street stockholders will be held on April 28, 2023, to vote on the Merger ("Stockholder Vote").

6.     The violations and breaches referenced above must be cured in advance of the Stockholder Vote to enable Oak Street stockholders to cast informed votes with respect to the Merger. Therefore, Plaintiff seeks to enjoin the Defendants from taking any further steps to consummate the Merger and schedule the Stockholder Vote, until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover damages suffered by Plaintiff and other Oak Street stockholders as a result of such violations, and/or seek other appropriate relief.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction). The Court has subject matter jurisdiction over the claims for breach of fiduciary duty under Delaware law under 28 U.S.C. § 1367 (providing supplemental jurisdiction over all other claims that are related to claims in the action within the Court's original jurisdiction).

8.     This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiff's securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig*., No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

9.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, the Company's common stock trades under the ticker "OSH" on the New York Stock Exchange, which is headquartered in this District, and the false and misleading

Proxy was filed with the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## PARTIES

10.     Plaintiff is, and has been at all relevant times, a stockholder of Oak Street common stock.

11.     Defendant Oak Street is a Delaware corporation with its principal executive offices located at 30 W. Monroe Street, Suite 1200, Chicago, Illinois 60603. Oak Street operates a network of primary care centers within the United States serving Medicare beneficiaries.

12.     Defendant Mike Pykosz currently serves as the Company's Chief Executive Officer and Chairman of the Board, and has served as a member of the Board at all relevant times.

13.     Defendant Geoffrey Price currently serves as the Company's Chief Innovation Officer, and has served as a member of the Board at all relevant times.

14.     Defendant Griffin Myers, M.D., currently serves as the Company's Chief Medical Officer of Provider Engagement, and has served as a member of the Board at all relevant times.

15.     Defendant Robbert Vorhoff has served as a member of the Board at all relevant times.

16.     Defendant Srdjan Vukovic has served as a member of the Board at all relevant times.

17.     Defendant Paul Kusserow has served as a member of the Board at all relevant times.

18.     Defendant Kim Keck has served as a member of the Board at all relevant times.

4

19.     Defendant Cheryl Dorsey, M.D., has served as a member of the Board at all relevant times.

20.     Defendant Julie Klapstein has served as a member of the Board at all relevant times.

21.     Defendant Mohit Kaushal, M.D., has served as a member of the Board at all relevant times.

22.     Defendant Regina Benjamin, M.D., has served as a member of the Board at all relevant times.

23.     Defendants identified in paragraphs 12 to 22 are collectively referred to herein as the "Individual Defendants," and together with Oak Street, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS[1]

**Background of Negotiations Leading to Merger**

24.     In late October 2021, Centerview Partners LLC ("Centerview") facilitated the introduction of Defendant Pykosz and Mr. Tim Cook, Oak Street's Chief Financial Officer ("CFO"), to Mr. Shawn Guertin, CFO of CVS, to discuss, at a high level, the potential benefits of a strategic partnership between the two companies.

25.     On January 28, 2022, Guertin reconnected with Cook and Defendant Pykosz to discuss Oak Street's performance, and agreed to schedule an operational discussion among representatives of both companies to continue to explore whether a potential commercial partnership or other strategic transaction would be beneficial to both companies and their respective stockholders. Another meeting between representatives of CVS and Oak Street occurred on March 21, 2022.

26.     Later in the year, in a meeting between representatives of CVS and Oak Street on

---

[1] Any emphasis in quoted language is added, unless otherwise noted.

September 21, 2022, CVS expressed a potential interest in acquiring Oak Street. Thereafter, at various points during October 2022, CVS reiterated its interest in a potential acquisition of Oak Street.

27.     On November 1, 2022, the Oak Street Board authorized Oak Street management to formally engage Centerview to serve as a financial advisor to Oak Street with respect to a potential strategic transaction. Centerview subsequently provided the Board with relationship disclosures on December 7, 2022, and on December 13, 2022. Based on such disclosures, both Oak Street senior management and the Board concluded that there were no conflicts of interest that would affect the ability of Centerview to fulfill its responsibilities as financial advisor to Oak Street. As discussed below, however, the Proxy fails to disclose that Centerview was affected by a material potential conflict of interest because of the dual role of David Dorman ("Dorman") as a founding and still active partner of Centerview's private equity division, and Chairman of the CVS board of directors through May 11, 2022 (when discussions between CVS and Oak Street concerning a potential transaction were already well underway). Further, even after stepping down as Chairman of the CVS board of directors in May 2022, Dorman apparently still owns over $11 million of CVS stock. *See* discussion *infra*.

28.     On November 7, 2022, during a meeting with Oak Street representatives, CVS submitted a verbal, non-binding indication of interest to acquire all of the issued and outstanding shares of Oak Street Health at a price of $28.00 per share in cash. On November 14, 2022, at a meeting between CVS and Oak Street representatives, CVS verbally raised its bid to $34.00 per share in cash.

29.     On November 20, 2022, at the direction of the Board, Centerview contacted representatives of four potential strategic acquirors—"Party A", "Party B", "Party C" and "Party

D"—by email to offer them the opportunity to enter into a confidentiality agreement and receive certain due diligence information if they were interested in a potential transaction with Oak Street.

30.     Over the course of November 21, 2022 and November 22, 2022, representatives of Parties A, B and C indicated that they were interested in a potential transaction involving Oak Street. All three parties subsequently entered into confidentiality agreements with Oak Street. Notably, however, discussions with Parties A, B and C were managed by Centerview. In contrast, negotiations with CVS were handled directly by CVS senior management.

31.     On November 27, 2022, the Board approved financial projections ("Projections") prepared by Oak Street's senior management for the remainder of fiscal year 2022 and fiscal years 2023 through 2028. The Projections were provided to (i) CVS and other potential counterparties participating in the strategic review process who had entered into confidentiality agreements with Oak Street, and (ii) Centerview for use in its financial analyses and preparation of a fairness opinion. The Proxy further discloses that Oak Street management also prepared extrapolations ("Extrapolations") of the Projections for fiscal years 2029 through 2037, and certain analyses related to the expected utilization of federal and state NOL carryforwards through 2032, which were provided to Centerview for use in its financial analyses and preparation of a fairness opinion. The Proxy, however, fails to disclose the Extrapolations, despite their use by Centerview to prepare its fairness opinion, as further discussed below.

32.     On December 7, 2022, at a meeting between CVS and Oak Street representatives, CVS verbally raised its bid to $38.00 per share in cash.

33.     On December 13, 2022, at a meeting between CVS and Oak Street representatives, Defendant Pykosz countered with a price of $43.00 per share in cash.

34.     On December 19, 2022, at a meeting between CVS and Oak Street representatives,

CVS countered with a price of $40.00 per share in cash.

35.     Later on December 19, 2022, Party B purportedly indicated to representatives of Centerview that it would consider a transaction to acquire Oak Street Health in a range of $31.00 to $32.00 per share, but that it did not see a pathway to increasing its valuation beyond the "mid $30s" per share range. At a meeting with the Board later that day, Oak Street's senior management noted that while there was a possibility that through additional diligence, Party B could eventually be in a position to offer beyond the "mid $30s" per share range, it was purportedly not clear whether Party B would be in a position to offer a value comparable to CVS's latest proposal, and even if Party B were to offer a value comparable to CVS's latest proposal, Party B purportedly was considerably less advanced than CVS Health in its diligence, was purportedly advocating for a less attractive transaction structure for Oak Street's business and a transaction with Party B purportedly presented potentially more regulatory risk than with CVS. In light of these purported considerations, the Board instructed *Centerview* to convey to Party B that its preliminary proposal was not at a level that properly reflected Oak Street Health's value and to report back to the Board for discussion of any response from Party B.

36.     At the same Board meeting, the Board then instructed *Oak Street senior management* to convey to CVS that the Board would be prepared to move forward to the next step of evaluating and negotiating a potential transaction at $41.00 per share, provided that the transaction included strong commitments from CVS on regulatory matters. This message was conveyed to CVS in a meeting between CVS and Oak Street representatives on December 20, 2022, and CVS responded the same day that the CVS board of directors was "also prepared to move forward expeditiously to the next step of evaluating and negotiating a potential transaction at $41.00 per share contingent upon Oak Street Health entering into exclusivity with CVS Health

for 45 days in order to complete due diligence and negotiate definitive transaction documents with respect to a potential acquisition."

37.     Later on December 20, 2022, Centerview advised Party B that the Board was not willing to proceed with a transaction at the valuation proposed by Party B. The Proxy does not indicate that Party B was ever afforded the opportunity to conduct further due diligence to facilitate a higher bid.

38.     On December 22, 2022, based on a price of $41.00 per share, Oak Street and CVS executed an exclusivity agreement providing for a 30-day exclusivity period. Oak Street then provided CVS with access to a virtual data room with additional diligence information regarding Oak Street. The Proxy does not indicate that any other counterparty received access to Oak Street's virtual data room.

39.     On January 17, 2023—after there were no competing bidders left—CVS advised that it was no longer willing to proceed at $41.00 per share and was reducing its proposed value to $38.00 per share, and indicated that such reduction was due to the "concentration level of payor-affiliated centers," but that CVS otherwise remained committed to pursuing a transaction with Oak Street. Later on January 17, 2023, Oak Street advised CVS that, in Oak Street's view, CVS's concerns with respect to Oak Street's payors and associated price reduction represented an unwarranted reduction in value.

40.     At a meeting on January 18, 2023, the Board instructed senior management to convey to representatives of CVS that the Board would consider proceeding with a transaction at $40.00 per share.

41.     On January 20, 2023, CVS's CEO, Karen Lynch ("Lynch"), advised Defendant Pykosz that the CVS board of directors had certain concerns with moving forward with the

potential transaction on the agreed timeline (which, at the time, contemplated an announcement on or around January 23, 2023), due to the proximity to the pending Medicare Advantage (MA) Risk Adjustment Data Validation (RADV) Program Final Rule (Final Rule) (the "RADV Final Rule") expected to be announced by the Centers for Medicare & Medicaid Services ("CMS") on or around February 1, 2023.

42.     On January 30, 2023, CMS issued the RADV Final Rule.

43.     On February 1, 2023, CMS released the 2024 Advance Notice for the Medicare Advantage (MA) and Part D Prescription Drug Programs (the "Advance Notice").

44.     On February 2, 2023, Lynch advised Defendant Pykosz that, following the issuance of the RADV Final Rule and the Advance Notice, CVS was prepared to move forward with a transaction at a price of $39.00 per share. That same day, the Board instructed Defendant Pykosz to inform Lynch that the Board was prepared to proceed with a transaction at $39.00 per share, and Defendant Pykosz so advised Lynch.

45.     On February 7, 2023, Centerview delivered its opinion ("Fairness Opinion") to the Board that the $39.00 per share in cash to be paid to Oak Street stockholders for their shares by CVS in connection with the Merger was fair from a financial point of view to such stockholders. Thereafter, the Board unanimously (i) determined that it was in the best interests of Oak Street and its stockholders to enter into the Merger Agreement; (ii) approved the execution and delivery of the Merger Agreement by Oak Street; and (iii) recommended that Oak Street stockholders approve the Merger at a special meeting to be convened.

46.     On February 8, 2023, Oak Street and CVS issued a joint press release announcing the Merger.

**The Proxy Contains Material Misrepresentations and Omissions**

47.     Defendants disseminated a false and misleading Proxy to Oak Street stockholders that misrepresents or omits material information, and thus deprives Plaintiff and other Oak Street stockholders of their right to cast informed votes with respect to the Merger.

***Material Omissions Concerning Potential Conflict of Interest of Centerview***

48.     An omission in a proxy is material if there is a substantial likelihood that a reasonable shareholder would consider the omitted fact important in deciding how to vote. That standard does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his or her vote, but only showing a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

49.     Because of the central role played by financial advisors in the evaluation, selection, and implementation of strategic alternatives, a proxy omits material information when it fails to disclose even *potential* conflicts affecting a target's financial advisor. In particular, the financial advisor's fairness opinion for a proposed transaction is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders and, in turn, for the stockholders' decisions on the appropriateness of the transaction. Thus, it is imperative for stockholders to be able to understand what factors might influence the analytical efforts of a target's financial advisor, including any potential conflicts.

50.     Indeed, courts have recognized that, because investment banking is a business based on relationships, potential conflicts arising out relationships between a buyer and a target's financial advisor provides a powerful incentive for the financial advisor to maintain good will and not "push too hard" during the negotiations and thereby risk antagonizing the buyer. A relationship

between a target's financial advisor and a buyer thus robs the financial advisor's fairness opinion of its value as an indicator of fairness.

51.     It is irrelevant that a potential conflict arises out of a relationship between a buyer and an affiliate of a target's financial advisor, and thus relationships between a buyer and an affiliate of a target's financial advisor must also be disclosed.

52.     By requiring disclosure of even potential conflicts of financial advisors and their affiliates, the federal securities laws and Delaware law afford shareholders the right to judge for themselves what significance to attribute to potential conflicts of interest that "might be perceived" to have undermined the loyalty and affected the judgment of financial advisors purporting to act on behalf of a target and its shareholders in connection with a transaction.

53.     Here, the Proxy discloses that, at various points during discussions with CVS and other potential counterparties in which Centerview was actively involved, the Board and senior Oak Street management reviewed relationship disclosure letters provided by Centerview, and repeatedly concluded "that there were **no** conflicts of interest that would affect the ability of Centerview to fulfill its responsibilities as financial advisor to Oak Street Health."

54.     The Proxy also states that "[i]n the two years prior to the date of its written opinion, Centerview was not engaged to provide financial advisory or other services to CVS Health, and Centerview did not receive any compensation from CVS Health during such period."

55.     Based on the above statements in the Proxy, a reasonable Oak Street stockholder would conclude that Centerview did not face *any* potential conflicts with respect to advising Oak Street on the sale to CVS, and in discussions with other potential counterparties to a strategic transaction. The statements above, however, are misleading because the Proxy fails to disclose a

significant potential conflict of interest affecting Centerview in its role as financial advisor to Oak Street.

56.     Centerview Capital Technology ("Centerview Capital") is the Silicon Valley-based private equity arm of Centerview, which is Centerview Capital's "parent organization." *See In re Dell Techs. Inc. Class V S'holders Litig*., 2020 WL 3096748, at *4, 36 (Del. Ch. June 11, 2020). Centerview and Centerview Capital share common business relationships, and Dorman's relationships serve as a source of business for both entities. *Id.* at 36.

57.     David Dorman co-founded Centerview Capital in July 2013, and remains one of three partners in the firm, "a role that constitutes his principal employment." *Id*. According to his LinkedIn profile and Centerview Capital's website, Dorman remains actively involved in the operation of Centerview Capital. *See* https://www.centerviewcapital.com/technology/team/

58.     At the same time, Dorman has a long history with CVS. He was appointed to the Board of Directors of CVS in March 2006, and began serving as Chair in May 2011. On March 10, 2022, CVS announced that Dorman had informed the CVS Board that he intended to retire at the end of his then current term and would not stand for re-election at the annual meeting on May 11, 2022. The announcement stressed that Dorman's retirement was not a result of any disagreement with CVS.

59.     According to a Form 4 filed on May 13, 2022, Dorman beneficially owned 147,575 shares of CVS common stock as of such date, which would presently be worth approximately $11.3 million at CVS's closing price of $76.25 per share on April 4, 2023.

60.     In sum, Dorman was simultaneously serving as Chairman of the Board of CVS and a partner at Centerview's private equity arm when Centerview first introduced representatives of CVS to representatives of Oak Street in late October 2021, and was still serving in both of those

roles when representatives of CVS reconnected with representatives of Oak Street in January 2022, and began discussing a potential transaction. It is thus certainly plausible that Dorman was involved in facilitating the introduction of CVS to Oak Street, and overseeing continued discussions.

61.     The potential conflict affecting Centerview arising out of Dorman's role as a partner at Centerview Capital and Chairman of the Board of CVS until May 11, 2022, is material since a reasonable Oak Street stockholder would consider it important to know that Centerview was negotiating against a company (i.e., CVS) in which one of its partners (i) had served as Chairman of the board of directors for nearly eleven years, including during the time when discussions between CVS and Centerview's client (i.e., Oak Street) about a transaction were already well underway, and (ii) apparently still has a substantial ownership interest. In particular, given that there were other potential counterparties interested in a transaction with CVS, it is plausible that Centerview's ties to Dorman and Dorman's ties to CVS might have led Centerview to "tilt the playing field" in favor of CVS during the strategic process as against other potential counterparties with no past ties to Dorman. On that note, it is significant that, according to the Proxy, (i) Centerview managed discussions with Parties A, B, and C (aside from presentations that Oak Street management gave to Parties A, B, and C), whereas Oak Street's senior management directly handled discussions with CVS, and (ii) only CVS was given access to Oak Street's virtual data room. It is further plausible that had Party B been given access to the same amount of due diligence as CVS, and the same access to Oak Street senior management, it might have been willing to raise its initial indication of interest from the "mid-30's" range.

62.     As such, Defendants must file a supplemental disclosure with the SEC to correct the misleading impression that Centerview did not have *any* potential conflict of interest, and

advise Oak Street stockholders of Dorman's existing relationship with Centerview, and Dorman's past role at CVS (including the overlap of Dorman's service with the discussions between CVS and Oak Street), so that Oak Street stockholders can decide for themselves what weight to assign to this potential conflict of Centerview when deciding how to vote with respect to the Merger.

### *Material Omissions Concerning the Projections Prepared by Oak Street Management*

63.     Stockholders consider it important to know management's best estimate of a target's future cash flows when deciding whether to vote in favor of an all-cash buyout that would deprive them of the ability to share in the target's future prospects as a standalone company. Accordingly, the failure of a company to disclose management's financial projections in a proxy—when those projections have been relied on by a financial advisor to render a fairness opinion—is a material omission.

64.     Here, the Proxy discloses that in connection with the evaluation of potential strategic alternatives, Oak Street's management team prepared the Projections and the Extrapolations, and provided *both* to Centerview for use in conducting financial analyses and preparing the Fairness Opinion.  The Proxy, however, only discloses the Projections, but does not disclose the Extrapolations.

65.     The failure to disclose the Extrapolations thus constitutes a material omission, and Defendants must file a supplemental disclosure with the SEC disclosing the Extrapolations to Oak Street stockholders.

### *Material Omissions Concerning Centerview's Fairness Opinion*

66.     A financial advisor's fairness opinion is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders. Here, however, the Proxy's presentation of the analyses upon which the Fairness Opinion was based suffers from

material omissions, which renders Oak Street stockholders unable to evaluate the validity of these analyses and thus cast informed votes with respect to the Transaction.

67.     With respect to Centerview's *Selected Public Company Analysis*, the Proxy fails to disclose the enterprise value of the five companies listed on page 47 of the Proxy that Centerview selected to perform this analysis. This omission impairs the ability of Oak Street stockholders to fully evaluate the validity of this analysis because Oak Street stockholders are unable to confirm whether the selected companies are sufficiently comparable to Oak Street in terms of their relative size.

68.     With respect to Centerview's *Selected Transaction Analysis*, the Proxy fails to disclose the enterprise value of each of the targets in the nine transactions listed on page 48 of the Proxy that Centerview selected to perform this analysis. This omission impairs the ability of Oak Street stockholders to fully evaluate the validity of this analysis because Oak Street stockholders are unable to confirm whether the targets in the selected transactions are sufficiently comparable to Oak Street in terms of their relative size.

69.     While the underlying data necessary to calculate equity value in connection with the above analyses may be public, targets soliciting stockholder approval may not send stockholders on a scavenger hunt in order to understand a financial advisor's analysis.

70.     With respect to Centerview's *Discounted Cash Flow Analysis*, the Proxy discloses that Centerview used "discount rates ranging from 11.25% to 13.50%, but fails to adequately disclose how Centerview determined that range was appropriate. The explanation that the discount rate range reflects an estimate of Oak Street's "weighted average cost of capital" is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments that Centerview used. If the discount rate range used by Centerview is artificially

high, it would have depressed the value ranges generated for Oak Street's shares. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range).

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

71.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

72.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

73.    Defendants disseminated a false and misleading Proxy, which made statements that are false and misleading, and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

74.    By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy

necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

75.     Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and/or (ii) omitted material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Oak Street stockholders to vote in favor of the Merger. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

76.     The material misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Oak Street stockholder would consider them important in deciding whether or not to vote in favor of the Merger. In addition, a reasonable Oak Street stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Oak Street stockholders.

77.     Since, according to the Proxy, Oak Street cannot consummate the Merger unless the proposal to adopt the Merger Agreement is approved by the affirmative vote of the holders of a majority of the shares of Oak Street common stock issued and outstanding entitled to vote at the Special Meeting, the Proxy soliciting the votes of Oak Street stockholders is an essential link in the accomplishment of the Merger. Thus, causation is established.

78.     Plaintiff and other Oak Street stockholders have no adequate remedy at law, and are threatened with irreparable harm insofar as Plaintiff and other Oak Street stockholders will be deprived of their entitlement to cast fully informed votes with respect to the Merger if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

79.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of Oak Street within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Oak Street, and participation in, and/or awareness of Oak Street's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Oak Street with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially false and misleading, and the omission of material facts specified above. Indeed, the press release announcing the Merger stated that "CVS Health, Oak Street Health and *certain of their respective directors and executive officers* may be deemed to be participants in the solicitation of proxies from Oak Street Health's stockholders in connection with the proposed transaction."

81.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to

approve the Merger, and recommend that Oak Street stockholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

83.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval.

84.     By virtue of the foregoing, the Individual Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

85.     Plaintiff and other Oak Street stockholders have no adequate remedy at law, and as a result of the Individual Defendants' violations of Section 20(a) of the Exchange Act, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger. Therefore, injunctive relief is appropriate.

## COUNT III

**Against the Individual Defendants for
Breach of Fiduciary Duty Under Delaware Law**

86.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

87.     The Individual Defendants, as directors of a Delaware corporation, owed Plaintiff and other Oak Street stockholders fiduciary duties of due care, good faith, candor, and loyalty under Delaware law.

88.    The Individual Defendants breached their fiduciary duties under Delaware law by omitting material facts from the Proxy that were necessary for Plaintiff and other Oak Street stockholders to know in order to cast fully informed votes with respect to the Merger.

89.    The facts omitted from the Proxy as detailed above were material because there is a substantial likelihood that a reasonable Oak Street stockholder would consider such facts important in deciding how to vote, and would have viewed disclosure of such facts as having significantly altered the 'total mix' of information made available.

90.    As a result of the Individual Defendants' breaches of fiduciary duty, Plaintiff and other Oak Street stockholders will be harmed by being deprived of their right to cast fully informed votes with respect to the Merger.

91.    Plaintiff and other Oak Street stockholders have no adequate remedy at law, and as a result of the Individual Defendants' breaches of fiduciary duty, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger. Therefore, injunctive relief is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Oak Street stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

B.    Finding Defendants liable for violating Sections 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

C.      Finding the Individual Defendants liable for violating Section 20(a) of the Exchange Act, and breaching their fiduciary duties under Delaware law;

D.      Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff and other Oak Street stockholders rescissory damages;

E.      Directing Defendants to account to Plaintiff and other Oak Street stockholders for all damages suffered as a result of their misconduct;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

G.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: April 4, 2023                    **WOHL & FRUCHTER LLP**


                                        By:/s *Joshua E. Fruchter*
                                        Joshua E. Fruchter (JF2970)
                                        25 Robert Pitt Drive, Suite 209G
                                        Monsey, NY 10952
                                        Tel: (845) 290-6588
                                        Fax: (718) 504-3773
                                        Email: jfruchter@wohlfruchter.com

                                        *Attorneys for Plaintiff*